**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Christopher Crosby

    v.                                    Civil No. 12-cv-383-LM
                                          Opinion No. 2014 DNH 100
Strafford County Department of
Corrections, Correction Officer
Richard Nadeau, Correction
Officer Joseph Darko-Mensha,
Correction Officer Brent Chapple,
Correction Officer David Baggs,
Lt. Donna Roy, Cpl. Gary Cormier,
and Jacob Braley

**O R D E R**

    Plaintiff is a former pre-trial detainee at the Strafford
County House of Corrections ("HOC").  His case now consists of
three state law claims, all arising out of a beating he received
from Jacob Braley, a fellow inmate.  Before the court is a
motion for summary judgment filed by all defendants other than
Braley.  Plaintiff objects.  For the reasons that follow,
defendants' motion for summary judgment is granted.

**I. Summary Judgment Standard**

    A movant is entitled to summary judgment where he "shows
that there is no genuine dispute as to any material fact and
[that he] is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  In reviewing the record, the court construes all

facts and reasonable inferences in the light most favorable to the nonmovant. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013).

## II. Background

Cristopher Crosby became a pre-trial detainee in the HOC on September 13, 2011.  At all times relevant to this matter, he was assigned to Housing Pod 1, which consists of six individual housing units plus a shared recreation yard.  The inmates on Pod 1 are supervised by one or two correctional officers.  Those officers are generally posted to an officers' station, called "the bubble," which has a view of all six housing units and the recreation yard.

Crosby was housed in the same unit as Jacob Braley. Between September 24 and September 28, 2011, Braley told Crosby that "he would kick [Crosby's] ass, but he was afraid [Crosby would] tell on him."  Pl.'s Mem. of Law, Shaines Aff., Ex. 1 (doc. no. 67-3), Crosby Dep. 34:8-9, Mar. 10, 2014.  Crosby made one complaint about Braley's threat, directed to Correction Officer ("CO") Richard Nadeau.  See Defs.' Mem of Law, Ex. A (doc. no. 66-3), Crosby Dep. 101:3-4, Mar. 10, 2014; see also id. at 103:17-20 ("I only made one complaint about Jacob Braley. And I believe that one was [to] Nadeau.").

2

In addition to being threatened by Braley, Crosby was
harassed and/or threatened by several other inmates.  Crosby
directed complaints about the conduct of inmates other than
Braley to CO Nadeau, CO Joseph Darko-Mensha, CO Brent Chapple,
Cpl. Gary Cormier, and Lt. Donna Roy.  Beyond producing evidence
that he told CO Nadeau about Braley's threat, Crosby has
produced no evidence that he made complaints about specific
inmates to specific correctional officers.  Every officer to
whom Crosby reported harassment or threats responded by telling
him that there was nothing he or she could do without actually
witnessing an act of harassment or a threat.  Some of the lower-
ranking officers did, however, report Crosby's complaints up the
chain of command.

At some point before October 20, 2011, Crosby sent an
inmate request slip to CO David Baggs, the HOC's classification
officer.  Crosby asked for a meeting with CO Baggs to discuss
issues in his housing unit.  CO Baggs met with Crosby, and
Crosby "told him what was going on, about all the threatening,
harassment, and all that stuff."  Crosby Dep. (doc. no. 67-3)
67:2-4.  About 25 minutes later, CO Baggs went to Crosby's
housing unit and told the inmates there that "if the harassment
and the threats on the [unit] . . . didn't stop, that there was
going to be some type of punishment."  Id. at 67:10-12.

Within a week after CO Baggs spoke to the inmates in
Crosby's unit, Braley assaulted Crosby in Pod 1's recreation
yard after Crosby defeated him in a game of one-on-one
basketball.  It is undisputed that Crosby had entered the
recreation yard voluntarily, along with Braley and two other
inmates, Anthony Papile, and Nicholas Arrain.  It is also
undisputed that Crosby had previously played basketball with
Braley in the recreation yard without incident.  On the night of
the assault, CO Chapple was stationed in the bubble on Pod 1.
In addition to generally supervising six housing units and the
recreation yard, the officer assigned to the bubble is also
"responsible for cell inspections, movement of inmates between
the Housing Pod and other units, interacting with inmates via
the intercom system, reviewing and distributing inmate mail,
both incoming and outgoing, and taking head counts at the
beginning of the shift and for meals."  Defs.' Mem. of Law, Ex.
G, Chapple Aff. (doc. no. 66-6) ¶ 3.

    After Crosby, Braley, Papile, and Arrain entered the
recreation yard, Crosby and Arrain played two-on-two against
Braley and Papile for about half an hour.  Then Arrain and
Papile sat out, and Crosby played against Braley one-on-one, in
a game to seven baskets.  After Crosby scored his sixth basket,
Braley told him he better not make a seventh, or he, Braley,

4

would "choke him out."  Crosby scored a seventh basket, and then
Papile began to tease Braley about losing to Crosby.

Shortly thereafter, when Crosby went to pick up the ball
from a spot in the recreation yard that is not visible from the
bubble, Braley tried to put Crosby into a headlock.  A scuffle
ensued, and Crosby sustained various facial injuries.  During
the altercation, Braley put Crosby in a headlock three times,
and Crosby escaped each time.  When Braley would not leave him
alone, Crosby put Braley in a headlock, but released it about a
minute later.  Then, according to Crosby:

> I started walking away.  When my back was turned
> toward him, he put me in another headlock, [and] got
> me to the ground.  And I started pushing myself out
> towards the middle of the floor so the COs could see
> me.  I was hollering, "Help, help," and . . . no one
> could hear me.

Crosby Dep. (doc. no. 67-3) 79:19 – 80:2.  While Braley had
Crosby in a headlock, Braley punched him in the face several
dozen times, drawing blood.

During the altercation, Papile and Arrain blocked the
intercoms in the recreation yard, to keep Crosby from getting to
them and seeking assistance from CO Chapple.  In addition,
Papile told Braley that CO Chapple was not looking into the
recreation yard because he was talking with an inmate in an
adjacent housing unit.  In all, the assault lasted about 15
minutes, and ended without intervention by Chapple or any other

correctional officer.  After the fight was over, Braley used the intercom to ask CO Chapple to open the door to the recreation yard so he could return to his cell.  CO Chapple did so.  A few minutes later, Papile used the intercom to ask CO Chapple for a mop he could use to clean up Crosby's blood from the floor of the recreation yard.  As soon as Chapple learned that Crosby was bleeding, he asked Crosby what had happened, and Crosby told him about the fight with Braley.

In response to his beating by Braley, Crosby sued nine defendants in eight counts.  Several of his claims have since fallen by the wayside.  His federal claims (Counts I, II, and IV) were all dismissed because he failed to exhaust the administrative remedies available to him.  See Order (doc. no. 48) 20.  Based upon that ruling, the court stated that "the case remain[ed] on track for trial of Counts VI, VII-A, VII-B, VIII, and IX."  Id.  At the same time, the court ordered plaintiff to show cause: (1) why Count VIII should not be dismissed because the claim stated therein appeared to duplicate the claim stated in Count VII-B; and (2) why his claim against Sgt. Edward McGowen should not be dismissed, due to his failure to perfect service on McGowen.  Plaintiff has not complied with the show-cause order.  Accordingly, Count VIII and plaintiff's claim against McGowen are dismissed.  Thus, this case now consists of:

(1) a negligence claim against defendants Roy, Cormier, Nadeau,
Darko-Mensha, Chapple, and Baggs (Count VI); (2) a claim of
negligent supervision against the Strafford County Department of
Corrections ("SCDC") (Count VII-A); (3) a claim of "negligent
failure to protect" against the SCDC (Count VII-B); and (4) a
claim of assault and battery against Braley (Count IX).

### III. Discussion

Defendants move for summary judgment on a variety of
grounds, but their reliance upon governmental immunity carries
the day.  The court begins with the claims against the SCDC and
then turns to the claims against the individual defendants.

A. Strafford County Department of Corrections

In Count VII-A, plaintiff claims that he was assaulted by
Braley because the SCDC breached its duty to properly supervise
the individual defendants' responses to his "reports and
requests to them for protection."  Third Am. Compl. (doc. no.
65) ¶ 64.  In Count VII-B, without identifying any particular
conduct, plaintiff claims that the SCDC breached its duty to
protect him from Braley's assault.  Defendants argue, correctly,
that the SCDC is entitled to governmental immunity from
liability on the claims stated in Counts VII-A and VII-B.

In New Hampshire, governmental immunity is rooted in statute.  Specifically:

> RSA 507–B:5 provides immunity to "governmental
> unit[s]" for "any action to recover for bodily injury,
> personal injury or property damage except as provided
> by this chapter or as is provided or may be provided
> by other statute."  One such exception to RSA 507–B:5
> is RSA 507–B:2, which states that "[a] governmental
> unit may be held liable for damages in an action to
> recover for bodily injury, personal injury or property
> damage caused by its fault or by fault attributable to
> it, arising out of ownership, occupation, maintenance
> or operation of all motor vehicles, and all premises."

Dichiara v. Sanborn Reg'l Sch. Dist., 165 N.H. 694, 696 (2013).

In Dichiara, the plaintiff sued a school district and a basketball coach to recover for injuries he suffered while participating in a drill that was a part of the try-out process for his high school basketball team.  See id. at 695.  The school district and the coach defended on grounds of governmental immunity.  See id.  In granting summary judgment to the defendants, Judge Wageling ruled

> that the plain language of RSA 507–B:2 limits
> negligence claims against governmental units to those
> "arising out of ownership, occupation, maintenance or
> operation of all motor vehicles, and all premises,"
> and [found] that the plaintiff's injury did not arise
> out of the operation of the premises.

Id.  On appeal, the plaintiff did not challenge Judge Wageling's determination that his injury did not arise out of the operation of a premises.  See id.  Rather, he argued that RSA 507–B:2 should be read "to permit recovery in fault-based actions . . .

absent a connection to a motor vehicle or premises." Id. at
696.  In rejecting that argument, the court observed that "most
personal injury actions are unlikely to involve a nexus with a
premises or vehicle." Id. at 698.  As an example of a factual
scenario in which such a nexus would exist, the court explained
that "in a proper case, a governmental unit could be liable to a
bystander for negligent infliction of emotional distress arising
from the negligent operation of a motor vehicle by an employee."
Id.  The court's description of what a nexus might look like in
the proper case is a clear signpost that if the plaintiff had
appealed Judge Wageling's determination that his injury did not
arise out of the defendants' operation of a gymnasium, the
supreme court would have affirmed.

In affirming the grant of immunity in Dichiara, the supreme
court relied on its previous decision in Chatman v. Strafford
County, 163 N.H. 320 (2012).  In that case, the plaintiff sought
to recover for injuries he received when, as an inmate, he was
directed to hitch a trailer to a truck, and "a weld on the
trailer jack and/or the hitch failed, causing the trailer to
fall on the [his] left leg and ankle." Id. at 321.  Because
hitching a trailer to a truck qualified as operation of a motor
vehicle, the supreme court reversed the trial court's ruling

that Strafford County and the SCDC were entitled to immunity under RSA 507-B:2.  See id. 325-26.

In reaching its decision in Chatman, the court pointed out the distinction between: (1) a motor vehicle being the location of a plaintiff's injury; and (2) the operation of a motor vehicle being the cause of a plaintiff's injury.  According to the court:

> For instance, "when a vehicle acts as merely the situs of an injury, the causal connection between the injury and the use of the vehicle is too tenuous to support coverage." [Concord Gen. Mut. Ins. Co. v. Doe, 161 N.H. 73, 76 (2010)]; see Akerley v. Hartford Ins. Group, 136 N.H. 433, 440 (1992).  Thus, in Akerley, we ruled that a police officer's insurer had no obligation to provide insurance coverage to the officer for injuries he sustained while removing an uninsured motorist from a vehicle because the vehicle was only the situs of the officer's injuries. Akerley, 136 N.H. at 440; cf. Lebroke v. U.S. Fid. & Guar. Ins. Co., 146 N.H. 249, 249-51 (2001) (no coverage for injuries sustained when intervenor was bitten by dog while loading brochures into automobile when automobile was merely situs of injury).
>
> By contrast, when the injuries stem from an act that is part of using a motor vehicle, the causal connection is established.  See Concord Gen. Mut. Ins. Co., 161 N.H. at 76.  For instance, in Wilson v. Progressive Northern Insurance Co., 151 N.H. 782, 783, 792 (2005), we held that when a taxi cab driver closed the cab's door on the passenger's dog's tail, causing the dog to bite the passenger's face, the injury arose out of the use of a motor vehicle.  We decided that the act of "closing the car door . . . is part of using [an] automobile." Wilson, 151 N.H. at 792.

163 N.H. at 324 (parallel citations omitted).

Here, defendants argue that the SCDC is entitled to
immunity because there is no causal nexus between plaintiff's
injuries and the SCDC's "ownership, occupation, maintenance or
operation of [any] motor vehicle[ ] [or] premises."  RSA 507-
B:2.  Plaintiff, in turn, argues that because it is undisputed
that the SCDC runs the HOC, his claims do arise from the
operation of a premises.

The problem with plaintiff's argument is that it ignores
the narrow interpretation of the phrase "arising out of . . .
operation of . . . all premises" employed by the trial court in
Dichiara and tacitly endorsed by the state supreme court.  Like
the plaintiff's claims against the school district in Dichiara,
plaintiff's claims here stem from alleged employee negligence
occurring on the employer's premises.  In the instant case,
plaintiff's claims arise from things that various correctional
officers did, or did not do, while supervising him and his
fellow inmates.  The HOC was "merely the situs" of plaintiff's
injuries.  Chatman, 163 N.H. at 324.  There is no evidence of
the kind of causal nexus between the operation of the premises
and plaintiff's injuries that the court in Dichiara and Chatman
described as sufficient to abrogate immunity.  Consequently, the

SCDC is immune from liability under RSA 507-B:2,[1] which entitles
it to judgment as a matter of law on Counts VII-A and VII-B of
plaintiff's third amended complaint.

### B. Nadeau, Darko-Mensha, Chapple, Baggs, Cormier and Roy

While styled as a single negligence claim against six
defendants, Count VI actually asserts three claims, arising from
three separate acts or omissions.  Specifically, plaintiff
asserts claims against: (1) Nadeau, Darko-Mensha, Chapple,
Cormier, and Roy, for refusing "to take steps to protect [him],"
Third Am. Compl. ¶ 57, after he told them that he was being
harassed and threatened by several inmates; (2) Baggs, for
threatening the inmates in his housing unit with punishment if
they continued harassing and threatening each other; and (3)
Chapple, for failing to intervene after Braley began assaulting
him.  The individual defendants argue, correctly, that they are
entitled to governmental immunity from the claims stated in
Count VI.

---

[1] In so ruling, the court recognizes that while adjudicating
an assault claim brought by an inmate, a judge of the New
Hampshire Superior Court ruled that the inmate's claims did
"arise out of the county's operation of the prison." Cherry v.
Hillsborough Cnty., No. 08-C-380, 2009 WL 8590200 (N.H. Super.
Ct. Oct. 5, 2009).  But the order in Cherry was issued without
the benefit of the supreme court's subsequent decision in
Dichiara and its expansive view of immunity under RSA 507-B:2.

While the primary focus of governmental immunity is the liability of governmental units, that doctrine also protects government employees.  Specifically:

> If any claim is made or any civil action is commenced against a present or former employee, trustee, or official of a municipality or chartered public school seeking equitable relief or claiming damages, the liability of said employee or official shall be governed by the same principles and provisions of law and shall be subject to the same limits as those which govern municipal liability, so long as said employee or official was acting within the scope of his office and in good faith.

RSA 507-B:4, IV.

The question here is whether Crosby has produced any evidence from which this court could reasonably conclude that any of the individual defendants was acting either outside the scope of his or her office, or in bad faith, while committing the acts or omissions on which Crosby bases his claims.  The answer to the first question is self-evident; Crosby neither alleged nor produced any evidence that any of the individual defendants was acting outside the scope of his or her employment when committing the alleged acts of negligence on which he bases Count VI.  Thus, defendants are protected by governmental immunity so long as the acts Crosby complains of were undertaken in good faith.  The only reasonable conclusion that may be drawn from the summary judgment record is that all of the individual defendants in this case did act in good faith.  The discussion

13

that follows begins with the relevant legal standard and then
focuses on each of the acts or omissions allegedly committed by
one or more of the individual defendants.

### 1. The Legal Standard

As Judge DiClerico has pointed out, RSA 507-B:4, IV, does
not define "good faith," and the New Hampshire Supreme Court has
not had the occasion to define that term for the purpose of that
statute.  See Holm v. Town of Derry, No. 11-cv-32-JD, 2011 WL
6371792, at *3 (D.N.H. Dec. 20, 2011).  In the face of similar
silence regarding the definition of the term "good faith" in New
Hampshire's Whistleblowers' Protection Act, RSA ch. 275-E, the
New Hampshire Supreme Court explained:

> While the term "good faith" is not defined in the
> statute, "[w]e give a statutory term that is not
> defined its plain and ordinary meaning." Board of
> Water Comm'rs, Laconia Water Works v. Mooney, 139 N.H.
> 621, 626, 660 A.2d 1121, 1125 (1995).  In the context
> of the Whistleblowers' Act, we define "good faith" as
> "absence of malice" and "honesty of intention."

Appeal of Osram Sylvania, Inc., 142 N.H. 612, 617 (1998)
(quoting Black's Law Dictionary 693 (6th ed. 1990); citing Tex.
Dep't of Crim. Justice v. Terrell, 925 S.W.2d 44, 60 (Tex. App.
1995).  Based upon the foregoing, this court concludes that if
asked to do so in the context of RSA 507-B:4, IV, the New
Hampshire Supreme Court would define "good faith" as "honesty in
belief or purpose" and "faithfulness to one's duty or

obligation." <u>Black's Law Dictionary</u> 808 (10th ed. 2014).  Thus, to avoid summary judgment, Crosby must produce evidence that the individual defendants failed to act in conformity with the standard of conduct described above.  He has not done so.

### 2. Failure to Act on Reports of Threats

Nadeau, Darko-Mensha, Chapple, Cormier, and Roy ("the five COs") move for summary judgment on the portion of Crosby's negligence claim that charges them with failing to protect him after he reported harassment and threats against him by other inmates.  They argue that the undisputed facts in the summary judgment record provide no basis from which the court could conclude that they did not act in good faith.  The court agrees.

Crosby's argument to the contrary consists of the following:

> The record includes circumstantial evidence of bad faith.  Crosby frequently reported the threats that the threatening group made.  Crosby did so verbally and in writing.  Crosby reported to Corrections Officers and their supervisors.  Despite rules requiring otherwise, no defendant had Crosby write a formal grievance.  Everyone told Crosby "There's nothing we can do.  There's nothing we can do about it unless we see the harassment – or we see an assault."  In the meantime, Braley's medical records put the Strafford County defendants on increasing notice that Braley was a threat.  Still, the defendants took no action.

Pl.'s Mem. of Law (doc. no. 67-1) 13 (internal quotation marks and citations to the record omitted).

As a preliminary matter, presuming that any of the five COs can be charged with knowledge of the content of Braley's HOC medical records, there is nothing in those records that would have reasonably put the five COs on notice that Braley posed a threat to Crosby, or any other inmate.  Generally speaking, the records on which Crosby relies document four visits Braley made to HOC mental health professionals because of his own concerns over depression and anxiety.  With respect to Braley's dangerousness, those records include a single relevant notation: "[Inmate] does not present as a danger to self or others at this time."  Defs.' Reply, Ex. C (doc. no. 68-3), at 2 of 3.  Rather than giving the five COs notice that Braley was a threat, those records indicate exactly the opposite, that the only time HOC mental health providers considered whether Braley was a threat to himself or others, they found that he was not.

Next, while Crosby argues that the five COs took no action in response to his complaints about harassment and threats, he also cites deposition testimony to the effect that on some occasions, correctional officers did pass his complaints up the line to their supervisors.  See Pl.'s Mem. of Law (doc. no. 67-1) 5.  That, obviously, constitutes action on his complaints.  And, he has produced evidence that both lower-ranking officers and their superiors told him that they did not take further

16

action in response to his complaints because they lacked first-
hand knowledge of the harassment and threats he was complaining
about.[2]  On the other hand, Crosby has produced no evidence that
the five COs ever failed to acknowledge his complaints or gave
acknowledgements that demonstrated any animus against him.  And,
he has produced no evidence from which the court could conclude
that the five COs acted dishonestly, disingenuously, or in
dereliction of their duties when they told him that they could
not take further action without direct evidence of the
harassment and threats.  In short, while Crosby has produced
evidence that he made frequent complaints to the five COs and
that they made no overt changes in the conditions of his
confinement to protect him from his antagonists, he has produced
no evidence that any of the five COs responded to his complaints
in bad faith.  Accordingly, the five COs are entitled to
governmental immunity and to judgment as a matter of law on
Crosby's claims that they are liable to him in negligence for
failing to act on his reports of threats by other inmates.

### 3. Baggs's Meeting on Crosby's Unit

In addition to arguing that he is entitled to judgment as a
matter of law on the merits of Crosby's claim that he acted

---

[2] Nowhere does Crosby suggest what additional action the
five COs should have taken to protect him.

negligently by threating the inmates on Crosby's unit with punishment if they persisted in harassing and threatening each other, Baggs also argues that he is entitled to governmental immunity from that claim.  Crosby does not even attempt to identify any evidence supporting the proposition that Baggs acted in an absence of good faith.  Baggs's immunity argument is persuasive.

In his complaint, Crosby alleges that "Baggs' announcement had the effect of notifying the other inmates that [he] had reported [their] behavior to SCDC and its agents and/or employees, which placed [him] in further danger of retribution by inmates, and particularly by Defendant Braley."  Third Am. Compl. ¶ 27.  But, in his deposition, Crosby testified that when CO Baggs met with the inmates in his housing unit, he did not mention any names.  And, Crosby has produced no facts that support his assertion that CO Baggs's talk with the inmates in his unit identified him as having complained to CO Baggs. Rather, the summary judgment record demonstrates that: (1) Crosby asked CO Baggs to help protect him from a group of inmates who had been harassing and threatening him; (2) CO Baggs took affirmative action on Crosby's request by meeting with the inmates in his housing unit and warning them to refrain from harassing and threatening each other, on pain of punishment; and

(3) CO Baggs never identified Crosby as the reason for his meeting with the inmates.  Baggs's talk with the inmates in Crosby's housing unit may have had the unintended consequence of inciting Braley to attack Crosby, but the occurrence of an unintended consequence is not evidence of bad faith.[3]  Based upon the undisputed facts in the summary judgment record, there is no evidence from which the court could conclude that CO Baggs acted in an absence of good faith when he met with the inmates in Crosby's housing unit.  That, in turn, entitles him to governmental immunity and to judgment as a matter of law on the negligence claim stated in Count VI.

### 4. Chapple in the Bubble

Chapple moves for summary judgment on Crosby's claim that he acted negligently by failing to intervene in the altercation in the recreation yard.  He argues, correctly, that he is protected from liability on that claim by governmental immunity.

As with the claim against Baggs, the applicability of governmental immunity turns on the question of good faith.  If Crosby had produced facts that would support a determination

---

[3] Indeed, the only evidence that Crosby's beating was a consequence of Baggs's meeting is the fact that the meeting took place about a week before the beating.  Such a temporal coincidence is necessary but not sufficient to establish causation.

that Chapple had witnessed the assault and stood by idly for 15 minutes while it ran its course, Chapple would have not acted in good faith.  That said, it is helpful to compare the facts of this case with those in Holm, in which Judge DiClerico ruled that a municipal employee was not entitled to immunity under RSA 507-B:4, IV.  See 2011 WL 6371792, at *3-4.  In Holm, it was undisputed that the defendant threw the plaintiff to the ground, placed him in a headlock, and sought governmental immunity by arguing that he had a good faith belief that the plaintiff had committed a crime and that he had the legal right to make a citizen's arrest.  See id. at *4.  In that case, the question of the defendant's good faith, and thus his right to immunity, hinged upon the credibility of his explanation for his actions. See id.  Here, before the court would even need to consider the credibility of an explanation for Chapple's conduct, it is necessary to determine whether Crosby has produced any evidence that Chapple's inaction could reasonably be characterized as somehow dishonest or a dereliction of duty.  Crosby has produced no such evidence.

It is undisputed that: (1) officers in the bubble, two at most, were responsible for supervising a pod consisting of six different housing units with a total capacity of 152 inmates, plus the recreation yard; (2) a portion of the recreation yard

is not visible from the bubble; (3) Crosby never told Chapple
that he had any problem with Braley; and (4) Chapple was not
aware from any other source that there were any problems between
Crosby and Braley.  Because it is undisputed that Chapple had no
knowledge of any animosity between Crosby and Braley, and knew
that they entered the recreation yard together voluntarily,
there is no evidence that he had a duty to exercise special
vigilance at the time of the assault, which took place in an
area of the pod that was occupied by four of the 152 inmates
Chapple was charged with supervising.

Turning from the facts concerning whether Chapple could
have or should have witnessed Braley's assault on Crosby, these
are the undisputed facts concerning whether Chapple did witness
the assault: (1) Crosby testified that a portion of the assault
took place in a part of the recreation yard that could not be
seen from the bubble, and that his calls for help from the
recreation yard were not audible from the bubble; (2) Crosby
produced evidence, albeit in the form of hearsay, that Chapple
was not looking into the recreation yard while the assault was
in progress; and (3) Chapple testified, via affidavit, that he
never saw the assault, see Chapple Aff. ¶ 6.  Crosby has produced
neither evidence, nor favorable inferences from evidence, that
would support a finding that Chapple actually saw or heard the

assault.  Rather, he has: (1) produced evidence that Chapple
could have seen the assault if it had taken place in a
particular part of the recreation yard; and (2) advanced a
factually unsupported argument that Chapple must have seen the
assault, or must have heard the sounds of a basketball game
change into the sounds of an assault.  However, absent evidence
from which the court could conclude that Chapple witnessed the
assault, or failed to witness it because he did not properly
carry out his duties as a correctional officer, there is no
basis for ruling that his failure to intervene was an exercise
of bad faith.[4]  Thus, the court concludes that at all relevant
times, Chapple was carrying out his duties as a correctional
officer in good faith, which entitles him to governmental
immunity and judgment as a matter of law on Crosby's claim that
he is liable in negligence for failing to intervene in the
assault.

### IV. Conclusion

For the reasons detailed above, defendants' motion for
summary judgment, document no. 66, is granted.  One loose end
remains.  Plaintiff's original complaint included a claim for

---

[4] Moreover, it is undisputed that as soon as Chapple learned
that Crosby had been injured, he asked Crosby what had happened.
That is evidence of Chapple's good faith.

assault and battery against Braley.  His third amended complaint
includes that claim, but it also includes all the claims that
the court dismissed in its order of September 3, 2014.
Moreover, Braley is not listed in the caption of plaintiff's
third amended complaint.  On the other hand, the parties' joint
statement of the case, document no. 59, lists Braley in its
caption, but does not mention any claim against him.  In short,
Braley's current status in this case is entirely unclear.  Thus,
plaintiff is directed to notify the court, within five days of
the date of this order, whether Braley remains a defendant.  If
so, this case will remain on track for a trial on Count IX.  If
not, the clerk of the court shall enter judgment in favor of
defendants and close this case.

    SO ORDERED.

_____
Landya McCafferty
United States District Judge


June 2, 2015

cc:  Jacob John Brian Marvelley, Esq.
     Daniel J. Mullen, Esq.
     Jacob Braley, pro se